In re Steven D. SMITH, Debtor.

Pamela K. Smith, Plaintiff,

v.

Steven D. Smith, Defendant.

Bankruptcy No. 00–10596–8C7.
Adversary No. 00–0559.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

June 29, 2001.

Doc. 38.)

Melody Genson, Sarasota, FL, for plaintiff.

Bernard J. Morse, Tampa, FL, for defendant.

## MEMORANDUM OF DECISION

### C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

In this adversary proceeding, the debtor/defendant's former wife, as plaintiff, seeks a determination that the debtor/defendant's dissolution of marriage obligation to pay lump sum alimony in periodic installments is "in the nature of alimony, maintenance, or support" and therefore not discharged pursuant to the provisions of Section 523(a)(5) of the Bankruptcy Code. The debtor/defendant characterizes the obligation as a division of property, however, and seeks the court's determination that the obligation is discharged. For the reasons set forth here, the court concludes that the obligation is in the nature of alimony, maintenance, or support and that it survives the debtor/defendant's Chapter 7 discharge.

### I.

The court tried this adversary proceeding on April 24, 2001. After considering all of the testimony, particularly the demeanor and credibility of the witnesses, the exhibits admitted at trial, the pleadings and stipulations filed by the parties, and the oral and written arguments of counsel, including the authorities cited by the parties, the court determines, by a preponderance of the evidence, the facts and issues as more specifically delineated below as required by F.R.B.P. 7052.

---

1. For ease of reference, the court will hereafter refer to the debtor/defendant as the "husband" and the plaintiff as the "wife".

### II.

The court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and the standing order of reference entered by the district court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). In addition, the parties have consented to the entry of final orders and judgment by this court, subject, of course, to appellate review under 28 U.S.C. § 158.

### III.

The husband[1] and wife[2] married on July 5, 1986. After the marriage, the wife worked in various unskilled jobs that paid approximately $200 per week. She had a high school education.

In 1989, shortly before the birth of their first child, the parties opened a wholesale bakery, Caribbean Pie Company ("CPC"), that specialized in the sale of pies to hotels and restaurants. The husband managed the business while the wife did bookkeeping and deliveries as her childcare schedule permitted.

In the early days of the business, both parties worked brief stints in second jobs to augment the income provided by CPC. Ultimately, they expanded CPC to include a retail operation located in Sarasota. Thereafter, the husband and wife worked exclusively in the business, and the income generated by CPC provided the sole means of support for the family. The wife began working full-time in the retail operation some time after the birth of their second child in 1992.

In 1997, after the business was firmly established, the parties purchased a home in Myakka City, Florida. They paid

---

2. See n. 1, supra.

$165,000 for the home, making a down payment of $10,000 and financing the remainder with a mortgage. The monthly mortgage payment was $1,365.

The wife ceased working in the business in 1999 because of marital strain. She then started working as a cashier at Publix earning $200 per week. She filed a petition for dissolution of marriage in May 1999. She remained in the marital home, however, because she could not afford separate accommodations. Her monthly income of approximately $900 was insufficient to pay rent, estimated to be about $900, and a car payment of $464, much less her other living expenses and personal obligations. Because of her insufficient finances, the wife sought an award of temporary alimony in the dissolution proceeding. In her motion for temporary alimony, the wife asked the court to "protect the income stream" of CPC.[3]

The wife filed a financial affidavit in the dissolution proceeding in which she stated under oath that her income at that time was $938 per month. The husband also filed a financial affidavit in the dissolution proceeding in which he stated under oath that his income at that time was $0 per month.

Neither party owned any personal assets other than their interests in CPC, the marital home, their automobiles, and their personal effects. Both were in good health. The parties were experiencing financial difficulties, however, in their personal and business finances. They periodically discussed the merits of filing a bankruptcy petition as a means of alleviating the financial pressures in their lives.

The dissolution of marriage proceeding went to trial in October 1999. In the midst of trial, the parties participated in a mediated settlement conference in which they reached a compromise of all contested issues. Both parties were represented by counsel. Counsel for the husband prepared the written document that incorporated the terms of the settlement.

The mediated settlement conference agreement contained terms agreed upon by the parties set out in separately numbered paragraphs. The agreement provided that:

1. The parties would share joint custody of the children, with the husband as the custodial parent (¶ 2). As a consequence, neither party paid child support to the other (¶ 3). The children were then age 7 and 9.

2. Neither party would receive alimony (¶ 7).

3. The husband was to pay certain expenses of the wife: $2,500 in moving expenses, $2,300 to the wife's attorney, $230 for the purchase of a television set, and $338 in payment of the wife's personal phone bill (¶¶ 11–13, 26). The husband also was to pay the costs of the mediation (¶ 9).

4. The husband further was to pay lump sum alimony to the wife in the amount of $124,800 (¶ 14). This lump sum alimony:

a. was to be paid in periodic installments of $300 per week for 416 weeks or eight years;[4]

---

**3.** There is nothing in the record as to the state court's disposition of the wife's motion for temporary alimony.

**4.** Based upon the ages of the children, these payments were scheduled to end approxi-

mately one month after the oldest child turned 18 years of age, but more than two years before the youngest child turned 18 years of age.

b. was not to cease upon the remarriage or death of the wife;

c. was not to be includable as income to the wife or to be deductible to the husband for federal income tax purposes;

d. was not to be modifiable due to a change in circumstances of either party; and

e. was to be non-dischargeable in the event of bankruptcy.

5. The husband was to obtain or maintain a life insurance policy naming the wife and the minor children as beneficiaries (¶ 15). All proceeds of the policy were to be applied first to the payment of the lump sum alimony obligation.

6. Each party was to retain his or her own vehicle and personal property. The wife was to retain a 1998 Toyota RAV4 automobile, and the husband was to retain a 1997 Dodge Ram truck (¶¶ 16–19).

7. Each party was to be responsible for his or her personal debts; the wife in the amount of $3,834.48 and the husband in the amount of $38,500 (¶¶ 20, 21).

8. The husband was to retain the marital home and also was to be liable for the mortgage debt (¶ 23).

9. The husband was to retain all rights to CPC as well as assume responsibility for its debts (¶ 25).

The court entered a final judgment dissolving the 13–year marriage on October 11, 1999. The judgment incorporated the terms of the mediated settlement conference agreement. The husband subsequently commenced weekly payments on the lump sum alimony, and the wife left the marital home.

About five months later, on March 20, 2000, the wife filed a Chapter 7 bankruptcy petition, Case No. 00–04078–8C7. The precipitating event causing this filing was collection action taken against the wife by her dissolution attorney. Specifically, in January 2000, the wife's dissolution attorney obtained a judgment against her for unpaid attorney's fees in the dissolution of marriage proceeding. The attorney then sought to collect that judgment by garnishing the husband's weekly lump sum alimony payments to the wife.

The state court held a hearing in the garnishment proceeding on March 6, 2000. Representing herself, the wife appeared and opposed the garnishment. Represented by his dissolution attorney, the husband also appeared and opposed the garnishment. Notwithstanding this opposition, the state court issued the writ of garnishment. Without the weekly payments, the wife was unable to pay her obligations and filed her Chapter 7 petition.

The husband initially consulted with a bankruptcy attorney in December 1999. With the weekly lump sum alimony payments garnished by the wife's dissolution attorney since March 2000, the husband stopped making the payments in June 2000. On July 7, 2000, the husband then filed his own Chapter 7 bankruptcy petition.

In Schedule A of his petition (Main Case Document No. 1), in which the debtor lists secured debts, the husband listed his homestead as having a value of $170,000 with a secured debt in the amount of $160,000. In Schedule F of his petition (Main Case Document No. 1), in which the debtor lists unsecured debts, the husband listed a debt owing to the wife in the amount of $124,000 for "equitable distribution." In Schedule I of his petition (Main Case Document No. 1), in which the debtor lists current income, the husband listed his income as $0. In Schedule J of his petition (Main Case Document No. 1), in which the debtor lists his current expenditures, the husband listed total expenditures of $3,640

per month, including an obligation in the amount of $1,290 per month for "alimony, maintenance or support paid to others."[5] Finally, in response to question #1 of the Statement of Financial Affairs, in which the debtor is asked to list all income he has received in the two years prior to the calendar year in which the petition is filed, the debtor indicated that in 1999 he earned an income of $20,000 from self-employment.

The wife filed this adversary proceeding on September 18, 2000, seeking to determine that the lump sum alimony obligation owed to her by the husband is non-dischargeable pursuant to Section 523(a)(5) of the Bankruptcy Code.

### IV.

Section 523(a)(5) of the Bankruptcy Code provides that:

(a) A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record . . . but not to the extent that—

\*　\*　\*　\*　\*　\*

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

■■■　Under this statutory scheme, divorce obligations that represent distribution of marital property are dischargeable. *In re Brody*, 3 F.3d 35, 38 (2d Cir.1993).

On the other hand, divorce obligations that represent or are in the nature of alimony, support, and maintenance survive the discharge. *Id.* Thus, "[t]his provision in the Bankruptcy Code departs from the general policy of absolution, or 'fresh start' in order to enforce an overriding public policy favoring the enforcement of familial obligations." *In re Sampson*, 997 F.2d 717, 721 (10th Cir.1993) (Internal quotations omitted). It is to be narrowly construed, however, against the creditor and in favor of the debtor. *In re Campbell*, 74 B.R. 805, 808 (Bankr.M.D.Fla.1987). The party seeking to determine the dischargeability of the debt, therefore, has the burden of proving the elements of Section 523(a)(5) by a preponderance of the evidence. *Cummings v. Cummings*, 244 F.3d 1263, 1265 (11th Cir.2001).

■■■　"Whether a given debt is in the nature of support is an issue of federal law." *Id.; Strickland v. Shannon (In re Strickland)*, 90 F.3d 444, 446 (11th Cir. 1996); *Rosin Law Offices, P.A. v. Lapsley (In re Lapsley)*, 230 B.R. 633, 637 (Bankr. M.D.Fla.1999). "Although federal law controls, state law does provide guidance in determining whether the obligation should be considered 'support' under § 523(a)(5)." *Cummings*, 244 F.3d at 1265. *See also, Brody*, 3 F.3d at 39 [the status of a payment under state law is relevant but not dispositive].

■■■　In this case, the state court issued a writ of garnishment against the lump sum alimony obligation. Although not exempt as wages within the meaning of Section 222.11, Florida Statutes, alimony payments are exempt from garnishment. *Waters v. Albanese*, 547 So.2d 197, 197 (Fla. 4th DCA 1989) [holding that alimony

---

**5.** Because there are 4.3 weeks in an average month, the $1,290 obligation obviously refers to the $300 weekly lump sum alimony payment to the wife ($300 times 4.3 equals $1,290).

payments are exempt from garnishment on public policy grounds]. The husband first argues, therefore, that the state court necessarily made a determination that the debt was not alimony and, by implication, not intended for the wife's support when the state court authorized the garnishment.[6]

The court has before it only the written documents presented on the motion for writ of garnishment and the court's order issuing the writ.[7] These documents do not indicate that any party raised an "alimony defense" to the motion for writ of garnishment or that the state court decided that the obligation was alimony or that it was not. To the contrary, the written documents presented on the motion for writ of garnishment suggest that the wife and husband instead unsuccessfully asserted as a joint defense to the motion their consensual waiver of the husband's payment of the lump sum alimony.

It is clear, however, that, unlike the positions they have adopted here, the husband and wife were allied in their opposition to the motion for writ of garnishment in the state court proceeding. In addition, the wife was without benefit of counsel in the garnishment matter and was in fact adverse to her attorney who was seeking to enforce a judgment against her.

In these circumstances, the court declines to draw any inference or reach any conclusions from the state court's issuance of the writ of garnishment. Accordingly, the court is required to consider the facts and circumstances present at the time the parties entered into the mediated settlement conference agreement to determine whether the lump sum alimony debt is a debt for or in the nature of alimony to, maintenance for, or support of the wife within the meaning of Section 523(a)(5).

▆▆▆▆ "[T]he label that the parties attach to a payment is not dispositive; the court must look to the substance, and not merely the form, of the payments." *Brody*, 3 F.3d 35 at 38; *In re Freeman*, 165 B.R. 307, 312 (Bankr.S.D.Fla.1994). "A debt is in the nature of support or alimony if at the time of its creation the parties intended the obligation to function as support or alimony." *Cummings*, 244 F.3d at 1265. "[T]he touchstone for dischargeability under § 523(a)(5) is the intent of the parties." *Id.* at 1266.[8]

▆▆▆▆ "The statutory language suggests a simple inquiry as to whether the obligation can legitimately be characterized as support, that is, whether it is in the *nature* of support." *Harrell v. Sharp (In re Harrell)*, 754 F.2d 902, 906 (11th Cir. 1985) (Emphasis supplied). "This inquiry, however, does not turn on one party's post hoc explanation as to his or her state of

6. If this issue were raised and determined in the garnishment proceeding, there could be collateral estoppel consequences here. *See, e.g., Securities & Exchange Commission v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir.1998) [setting forth elements of collateral estoppel].

7. Neither party put into evidence a transcript of the hearing on the motion for writ of garnishment.

8. In *Cummings*, the court suggested that the bankruptcy court might choose to await a clarification by the state court regarding what

portion—if any—of the equitable distribution was to be in the nature of support as an alternative to making its own determination. *Cummings*, 244 F.3d at 1267. In this case, the obligation at issue here is one that resulted by agreement of the parties and not one determined by the state court at a contested hearing. As a consequence, the state court is in no better position than is this court to determine the intent of the parties in creating the obligation in issue. Nothing can be gained, therefore, by sending this dispute back to the state court.

mind at the time of the agreement .... Rather, the critical inquiry is the shared intent of the parties at the time the obligation arose." *Sampson,* 997 F.2d at 723.

■■■■■ "The question of the parties' intent when they executed the [mediated settlement conference agreement] is one of fact." *Brody,* 3 F.3d at 38. "All evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent is relevant." *Id.*

The wife vehemently asserts that it was both parties' intention that the lump sum alimony obligation be used wholly for her maintenance and support. She emphasizes her inability to support herself without these weekly payments.

The husband just as adamantly argues that the parties intended the lump sum alimony to be a division of the marital property.[9] He asserts that the lump sum alimony was meant to equalize the parties' property distribution because he obtained the marital home and CPC. In other words, the husband argues that the lump sum alimony was the money equivalent to the interests he received in the marital home and CPC. The husband asserts that the marital home had substantial equity at the time of the marriage dissolution. The husband further asserts that the wife fixed the amount of $250,000 as the value of CPC and would not moderate that position in their negotiations in the dissolution of marriage proceeding. During the mediated settlement conference, the husband therefore acceded to the wife's valuation of the business, despite his own belief that the value was inflated, as a tactical means of resolving child custody issues. The husband further asserts that the property division was to be made by weekly payments purely as a consequence of the financial troubles that beset CPC at that time. Finally, the husband argues that the wife did not need support at the time of the marriage dissolution because she had the past and future ability to earn more than he did himself.

■■■ In these circumstances, the "intent [of the parties] can best be found by examining three principal indicators." *In re Gianakas,* 917 F.2d 759, 762 (3d Cir.

9. The husband supported his position with deposition testimony from his divorce attorney in lieu of live testimony at trial. The divorce attorney testified that the husband intended that the lump sum alimony obligation was to be a division of property rather than support. The divorce attorney also testified that he believed that the wife was in a better financial position than the husband at the time of the marriage dissolution proceeding. The attorney .bases his opinion of the husband's intent on conjecture and generalizations made from his written notes recorded at the time of the dissolution settlement conference. The attorney testified that he had a specific recollection that the lump sum alimony was to be a property division "because I pretty much do things the same way all the time." (Document No. 19, Tr. at 12, lines 9–11). In addition, the attorney makes factual assertions about the wife's personal and financial circumstances that are contradicted by other testimony and evidence that the court credits, especially relating to the parties very different incomes and financial abilities and circumstances. A reading of this deposition testimony shows that the attorney is less than impartial and was attempting to assist his client in this round of an extended divorce proceeding.

For these reasons, the court does not credit this witness's testimony concerning the husband's intent with respect to the lump sum alimony obligation or the husband and wife's financial circumstances at the time of the marriage dissolution proceeding.

Similarly, the court does not make any negative inferences from the wife's failure to offer the testimony of her divorce attorney as to her intent with respect to the lump sum alimony obligation. The wife is now adverse to her attorney, who suffered an economic loss as a result of his representation of her in the dissolution proceeding.

1990).[10]

## A.

■ "First, the court must examine the language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary." *Id.*

■ In this case, there are some aspects of the mediated settlement agreement that tend to support a conclusion that the lump sum alimony was intended to be a property settlement. For example, the lump sum alimony payments did not cease upon the wife's remarriage or death. *Campbell,* 74 B.R. at 810. The payments were not includible to the wife as income or deductible by the husband as alimony for federal income tax purposes. *Horner,* 222 B.R. at 923. In addition, the alimony support was to be non-modifiable. *Cummings,* 244 at 1265, *but see Kirchen v. Kirchen,* 484 So.2d 1308, 1311 (Fla. 2d DCA 1986) ["A trial court is free to modify an agreement which is not a pure property settlement agreement."].

■ On the other hand, there are aspects of the mediated settlement agreement that tend to support a conclusion that the lump sum alimony was intended to be support. For example, the marriage was long-term. *In re Custer,* 208 B.R.

675, 680 (Bankr.N.D.Ohio 1997). Also, the provision for lump sum alimony was set apart in the mediated settlement agreement from the property division of the parties' real and personal property and especially of CPC. *Freeman,* 165 B.R. at 313. The lump sum alimony was payable in monthly installments over a long period of time. *Sampson,* 997 F.2d at 724 n. 5. It was to be non-dischargeable in bankruptcy. Other than the lump sum alimony obligation, there was no provision for support in the mediated settlement conference agreement. *Wright,* 184 B.R. at 322. The husband agreed to pay all of the joint expenses associated with the mediated settlement conference agreement as well as many of the immediate personal expenses of the wife because she lacked the ability to pay them herself.

In addition, neither party acquired substantially more property than the other. *Id.* at 321. Looking at the property division in the context of the surrounding circumstances, and excluding the lump sum alimony, it is clear that each party received a substantially equal and equitable distribution of the marital property.

Each party received their vehicle and personal effects.

The husband acquired the marital home because, although he was to share custody

---

**10.** These indicators incorporate factors frequently cited in case law as supporting a determination of whether a debt is in the nature of property or support. *See, e.g., In re Horner,* 222 B.R. 918, 922 (S.D.Ga.1998) [citing as factors the amount and adequacy of alimony; need for support and relative income of the parties; number and age of children; length of the marriage; whether the obligation terminates on the death or remarriage of the former spouse; the duration of the payments; age, health, education, and work experience of the parties; whether payments are for economic security or retirement benefits; and the standard of living during the marriage]. *See also, In re Wright,* 184 B.R. 318, 321–22 (Bankr.N.D.Ill.1995) [citing as factors the contribution or dissipation of each party of the marital property; the value of property set apart to each spouse; the duration of the marriage; the financial circumstances of each spouse; the age, health, employability, amount and sources of income and needs of each party; the custodial provisions for minor children; whether the apportionment is in addition to or in lieu of maintenance; location in the document of the obligation in relation to the location of other property or support awards; and the opportunity of each spouse for future acquisition of capital assets and income].

jointly with the wife, he was to provide the primary physical residence for the children. The husband was responsible for the mortgage debt on the home. The parties made a minimal down payment when they purchased the home, and they had not been paying on the mortgage for very long. They therefore had accrued little equity in the property. Any equity that the property may have had was unrealizable at the time of dissolution because it would have been subsumed in transaction costs upon sale. Indeed, the husband's schedules (two years later) showed that the real property then had only $10,000 in equity, an amount that would largely disappear upon payment of the seller's costs of sale and closing. *In re Cobb*, 56 B.R. 440, 442 n. 3 (Bankr.N.D.Ill.1985) [court may consider schedules filed in the main case as evidential admissions by the debtor].

The husband testified at trial that the marital home had at least $40,000 in equity at the time of the marriage dissolution proceedings. He further testified that he was then in the process of borrowing against that equity but was unable to consummate the transaction due to the wife's refusal to quitclaim her interest in the property. The court does not credit this testimony for the purpose of establishing the value of the marital home in 1999. Whatever the husband's opinion of the home's value, the objective fact of the matter is that the home had no meaningful or significant equity at the time of the marriage dissolution proceeding.

The husband also acquired CPC, but it similarly had no intrinsic worth to the parties. At the time of the dissolution, CPC had debt in the amount of $125,000. It had no fixed assets, as the equipment required to bake and sell the pies was part of the leased premises.[11] Consequently, the business had no value other than its ability to generate income on a going forward basis. Moreover, it was the husband, rather than the wife, who determined the profitability of the business because he was responsible for its day-to-day operations and management. *See Freeman*, 165 B.R. at 315.

The court does not credit the various letters of intent to purchase CPC, all of which contained offers in excess of $250,000. Although there was little testimony about these letters, they contain on their faces numerous requirements and contingencies.[12] Accordingly, there is nothing about them upon which the court can rely to establish a value for CPC other than the value that the court has ascribed.

Although income can be capitalized for purposes of valuing a business, placing such a value on CPC in that manner would be unrealistic in these circumstances. Instead, CPC as it existed at the time of the dissolution of marriage proceeding is best viewed as simply an employment opportunity for the husband that permitted him to earn a salary that paid the family's bills and living expenses. The wife received no benefit from CPC other than its existence as her husband's employer. To capitalize the income to provide a value for CPC that would be equitably divided between the parties would artificially and unrealistically inflate the parties' financial position beyond reality. Instead, CPC is fairly and accurately reflected in the parties' finances at the time of the dissolution of marriage

---

11. Approximately one month prior to the mediated settlement conference, the landlord of those premises served a claim of lien on all assets and equipment of CPC contained in the leased premises.

12. The husband himself testified at trial that the purchase offers were unreasonably high.

proceeding in the husband's ability to earn an income.

Consequently, the court finds that CPC had no worth other than as a means to generate a monthly income for the husband.

▪ Finally, there are several aspects of the mediated settlement conference agreement that do not favor a conclusion on either side as to whether the lump sum alimony is property or support. For example, the absence of any child support to be paid by the husband to the wife where the parties were to share joint custody of the children is a neutral factor that does not mitigate against or militate in furtherance of a conclusion that the lump sum alimony is support. Similarly, the requirement that the husband provide insurance to be applied to the lump sum alimony is a neutral factor that does not help or hurt the wife's case. *Tilley v. Jessee,* 789 F.2d 1074, 1078 n. 3 (4th Cir.1986). Finally, the timing of the cessation of the husband's obligation to pay lump sum alimony in relation to the children's attainment of their majority is a neutral factor that does not affect the wife's case.

Upon consideration of the specific terms of the mediated settlement conference agreement in the context of the totality of the circumstances in which it was made, the court determines that the terms of the settlement agreement weigh more heavily in favor of the lump sum alimony being in the nature of support rather than a property division.

Among the many aspects of the mediated settlement conference agreement that tend to support the wife's position, it is perhaps the equal distribution of the parties' property, excluding the lump sum alimony, that is the most significant.

The provision that the lump sum alimony was to be non-dischargeable in bankruptcy is also very significant. This is not a case in which "it is likely that neither the parties nor the divorce court contemplated the effect of a subsequent bankruptcy when the obligation arose." *Cummings,* 244 F.3d at 1265. Indeed, the parties both testified at trial that in the months preceding the dissolution of marriage they periodically discussed filing bankruptcy as a viable means of alleviating their financial problems. Although the husband had not yet consulted a bankruptcy attorney, the spectre of bankruptcy was very real at the time the parties entered into the mediated settlement conference agreement. Thus, the parties specifically placed in their agreement the provision that the obligation in issue would survive a bankruptcy discharge. That specific provision weighs heavily in favor of finding their intent that the lump sum alimony was to be for the wife's support.

The court therefore determines that the first indicator supports a conclusion that the parties intended the lump sum alimony to be support rather than property.

*B.*

▪ Second, the court must consider "the parties financial circumstances at the time of the settlement." *Gianakas,* 917 F.2d at 763.

Both parties here were in good health and had no impediment to full-time employment. They shared equal responsibility for the financial and physical welfare of the children.

The wife testified in this proceeding that she made slightly more than $10,000 in 1999 through her employment as a cashier at Publix. She offered as corroborative evidence her income tax return for that year showing a gross income of $10,741. The court credits this testimony and evidence.

The wife had a high school education. In addition, she had worked in the family business for most of her married life and had few career skills. The wife had no reasonable expectation of an improvement in her employment in the future.

The husband testified in this proceeding that CPC was his only source of income in 1999 and that it was not performing well enough to support a salary.[13] The husband further testified that he used revenues of CPC to pay household and personal expenses in preference to CPC's business obligations, in effect "borrowing from Peter to pay Paul."

The court does not credit the husband's testimony on these points. The husband's testimony is not consistent with the parties' ability to obtain a substantial mortgage on the marital home shortly before the dissolution proceedings on the strength of the income generated by CPC and to maintain those payments thereafter. The testimony is also not consistent with the parties' ability to secure financing on the lease or purchase of their late model vehicles. Finally, the testimony is not consistent with the parties' ability to maintain their lifestyle for a number of years solely on the income generated by CPC.

The husband's testimony in this proceeding, supported by his financial affidavit filed in the dissolution of marriage proceeding, that his income at the time of the dissolution proceeding was zero is likewise not credible. The simple truth is that the debtor had the ability to manipulate his income in any way he chose due to his ownership and management of CPC.

Moreover, the husband's testimony is inconsistent with the information contained in his Statement of Financial Affairs (Main Case Document No. 1) sworn to under penalty of perjury and made a matter of record in this bankruptcy case. *Cobb*, 56 B.R. at 442 n. 3 [court may consider schedules filed in the main case as evidential admissions by the debtor]. In his Statement of Financial Affairs, the husband stated that he received income from self-employment in 1999 in the amount of $20,000, an income twice that of the wife. The debtor has provided no evidence in this proceeding to overcome the admission of income earned in 1999 contained in his statement of financial affairs.

The debt taken on by each party in the mediated settlement conference agreement is also indicative of the husband's earning power. He took on substantially more debt than the wife simply because he earned more money.

For these reasons, the court concludes that the husband had a superior earning capability than the wife and did in fact earn more throughout their married life.

Although the business had some financial troubles during 1999, the husband had a reasonable expectation of continuing income. Even if the business failed in the future, the husband had the skill, knowledge, and experience to perform the same services in a similar operation.[14] *See, e.g., Freeman*, 165 B.R. at 315 [finding that husband's continued operation of business would provide cash flow for support payments to wife].

The court concludes, therefore, that at the time the parties entered into the medi-

---

**13.** His divorce affidavit reflected a zero income.

**14.** Indeed, the husband testified at trial that that is exactly what he is now doing, without compensation, for his current wife who is presently engaged in operating a wholesale pie bakery business. Notably, the debtor's current wife has no background or experience in this kind of business. Thus, it is the debtor's knowledge and expertise in this business that is supporting the new company.

ated settlement conference agreement, the husband's financial circumstances were substantially better than the wife's. This indicator therefore supports a finding that the parties intended the lump sum alimony to be support rather than property.

## C.

■ Third, the court must consider "the function served by the obligation at the time of the divorce or settlement." *Gianakas*, 917 F.2d at 763. "An obligation that serves to maintain daily necessities such as food, housing and transportation is indicative of a debt intended to be in the nature of support." *Id.*

■ The wife testified that she did not earn enough at the time of the dissolution of marriage proceeding to afford separate housing, transportation, and food. The husband did not refute that testimony. The husband's agreement to pay personal expenses of the wife at the time of the dissolution is also indicative of the wife's need for support.

The evidence also shows that the wife did in fact need the weekly payments for her support. When the payments were stopped as a consequence of the garnishment, the wife was required to file her own bankruptcy petition.

The court therefore concludes that this indicator supports the conclusion that the wife needed the lump sum alimony for support and that the parties intended the alimony for that purpose.

## D.

■ The terms of the mediated settlement conference agreement do not fall neatly into a particular category. Each of the indicators, however, when viewed in the context of the totality of circumstances at the time the agreement was made, supports the conclusion that the parties in-

tended that the lump sum alimony be for the wife's maintenance and support.

This conclusion rests largely on the court's determination of the credibility of the parties. *See Brody*, 3 F.3d at 39. The court credited the testimony of the wife as supported by the evidence. The court did not credit the husband's testimony, finding it to be self-serving and inconsistent with the evidence and common sense.

The court must conclude, therefore, that the parties intended the lump sum alimony obligation to be for the wife's support and maintenance irrespective of whether it was derived from marital property or prospective income of CPC. Accordingly, the wife has established by a preponderance of the evidence that the lump sum alimony is a debt for maintenance, alimony, or support within the meaning of Section 523(a)(5).

## V.

■ *Cummings* teaches us that we must also determine the extent to which the debt is for the wife's maintenance or support, that is, whether all or only some of the debt was intended to be for the wife's maintenance or support. *Cummings*, 244 F.3d at 1266–67.

■ The court has previously determined that, without considering the lump sum alimony, neither party received substantially more property than the other in their division of the marital assets. The wife would clearly receive more than her equitable share of the marital property, therefore, if the court now determines that some portion of the lump sum alimony is in fact a division of property.

In addition, the court has previously determined that the wife had a direct need for support at the time of the dissolution because she was otherwise unable to maintain the most basic necessities of shelter, transportation, and food.

For these reasons, therefore, the court concludes that the entirety of the lump sum alimony obligation was intended to be for the wife's maintenance and support and that no part was intended to be a division of the marital property.

### VI.

Accordingly, the lump sum alimony obligation, in the amount of $124,800, is excepted from the husband's discharge. The court is contemporaneously entering judgment consistent with this memorandum of decision.